```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,                    :
                                             :
                    Plaintiff,               :
                                             :         MEMORANDUM AND ORDER
            -against-                        :             06-CR-265 (DLI)
                                             :
LUIS M. BATISTA, et al.,                     :
                                             :
                    Defendants.              :
-----------------------------------------------------------------x
```

**DORA L. IRIZARRY, United States District Judge:**

The instant action arises out of a multi-defendant indictment alleging a narcotics trafficking conspiracy that involved, among others, three officers with the New York City Police Department ("NYPD"). Defendant Luis M. Batista, a member of the NYPD, is charged with (i) conspiracy to distribute cocaine base ("crack"), cocaine, and ecstasy in violation of 21 U.S.C. § 841(a)(1), (ii) conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344, (iii) bank fraud in violation of 18 U.S.C. § 1344, and (iv) two counts of conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(c)(2). (*See generally* Superseding Indictment S-5 ("S-5"), Docket Entry No. 91.)

Batista has moved to suppress evidence obtained pursuant to a wiretap of his phone, which was authorized on December 5, 2006 by the Honorable Allyne R. Ross, United States District Judge of this court (the "Batista Wiretap"). Batista contends that, contrary to the requirements of 18 U.S.C. § 2518, the affidavit of the case agent, Federal Bureau of Investigation ("FBI") Agent John Nefzger ("Nefzger Affidavit"), shows that the government failed to exhaust alternative investigative techniques prior to seeking the wiretap. Batista also seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) asserting that the Nefzger Affidavit

1

contained material misrepresentations and omissions rendering the authorization void for lack of probable cause. (*See generally* Def. Mot. to Supp., Docket Entry No. 86.) Finally, Batista seeks an order compelling the government to provide a bill of particulars and additional discovery. The government opposed Defendant's motion in its entirety. (*See generally* Gov't Opp., Docket Entry No. 112.) On March 6, 2009, the court held oral argument on the issue of whether a *Franks* hearing is necessary to resolve Batista's motion. For the reasons set forth more fully below, Batista's motion is denied in its entirety.

## BACKGROUND

For purposes of this opinion, the following facts are considered undisputed by the parties,[1] and are taken from the Nefzger Affidavit.

Batista joined the NYPD in 1997. He rose to the level of detective in 2004, and was assigned to the 90th Precinct Detective Squad in Brooklyn. (Nefzger Aff. ¶ 4; S-5 ¶ 3.) At the 90th Precinct, he did not conduct narcotics-related investigations. (Nefzger Aff. ¶ 15.)

In April 2006, the government indicted Virgilio Hiciano, who is one of Batista's co-defendants, on narcotics-related charges. (Nefzger Aff. ¶ 18; S-5 ¶ 6.) In post-arrest statements, Hiciano admitted that he was involved with narcotics trafficking. Additionally, he indicated that he had known Batista for fourteen years and that Batista was aware of his drug trafficking activities. (Nefzger Aff. ¶¶ 21, 26.) In June 2006, Hiciano fled the United States to live in the Dominican Republic. (Nefzger Aff. ¶ 127.)

---

[1] These facts are taken from the Nefzger Affidavit and are assumed to be undisputed only insofar as Batista does not dispute them in his pretrial motion. The court understands that Batista may dispute some or all of these allegations at trial and nothing in this opinion will prevent him from doing so. Moreover, defendant does dispute certain allegations contained in the Nefzger Affidavit, which the court will address in resolving the instant motion.

Shortly thereafter, the government arrested co-defendant Alexander Alcantara (who is described as "Confidential Informant" or "CI" in the Nefzger Affidavit) on narcotics-related charges. (Nefzger Aff. ¶ 28.) In a post-arrest statement, Alcantara stated that Hiciano was his best customer, and that Hiciano had introduced him to Batista. (Nefzger Aff. ¶ 29.) Alcantara described two incidents of interest to the government. First, on one occasion, Hiciano lent his car to Batista, who inadvertently left his firearm in the car and had to retrieve it from Hiciano. (*Id.*) Second, on one occasion, Hiciano received a call from an unspecified telephone number. He spoke with the caller and then told Alcantara that it was Batista who had called to warn him of an impending NYPD drug raid at one of his drug locations. (Nefzger Aff. ¶ 31.)

The government then arrested Luis Calderon (who is described as "CW-1" in the Nefzger Affidavit) on narcotics-related charges and indicted him separately. (Nefzger Aff. ¶ 32.) In a post-arrest statement, Calderon admitted that he worked with Hiciano to distribute cocaine. (Nefzger Aff. ¶ 33.) He indicated that Batista frequently went to bars with Hiciano. (Nefzger Aff. ¶ 36.) Additionally, he stated that he was present on occasions when Hiciano and Batista spoke on the phone. (*Id.*)

Calderon agreed to cooperate and placed a consensually-recorded telephone call to Batista on November 1, 2006. Batista asked Calderon to come to the station house of the 90th Precinct, where Batista was on duty at the time of the call. (Nefzger Aff. ¶ 38.) Batista and Calderon spoke at the station house. During their conversation, Calderon informed Batista that he had been arrested and expressed concern that Hiciano might be cooperating with the government. (*Id.*) Batista responded by stating:

> Checko[2] is in the Dominican Republic. In order for a person to talk they have to be here, not in another country. And I am sure he is in the Dominican Republic.

---

[2] "Checko" refers to Hiciano.

> For someone to talk they have to be in this country. And if they are offering protection they have to be here. To be out of the country they have no access to you. If you are out of the country, how will they prosecute you? Nobody, never. He is not talking.

(Nefzger Aff. ¶ 39.) Notably, at the time of this conversation, Hiciano was a federal fugitive, for whom a judge from this court had issued a bench warrant. (Nefzger Aff. ¶ 27.)

Shortly after meeting, Batista approached Sergeant Robert Kelly, his supervisor, to find out whether the NYPD's Internal Affairs Bureau ("IAB") was investigating him. (Nefzger Aff. ¶ 27.) In a later conversation, Batista told Kelly that one of his friends in IAB told him that IAB was investigating him. Batista discussed detailed information contained in confidential, secure IAB records, including that an informant told the police that Batista shared a woman, sexually, with two other men, with drugs present during the sexual encounter. (Nefzger Aff. ¶¶ 42-44.) He then pressed Kelly as to whether there had been any further activity in his IAB file.

Additionally, around this same time, a joint task force comprised of the New York City Special Narcotics Prosecutor's Office, the NYPD, and the Drug Enforcement Administration ("DEA") were investigating Juan Aracena, a known drug trafficker. The task force applied for wiretap authorization from a state court, which it received ("Aracena Wiretap"). A review of conversations intercepted on Aracena's telephone line indicated that Batista spoke with Aracena on three occasions.

## DISCUSSION

Based on the Nefzger Affidavit, Judge Ross authorized the Batista Wiretap. Batista contends that the evidence obtained must be suppressed. First, he contends that adequate, alternative investigative techniques were available, rendering the wiretap unnecessary. Thus, granting the application under these circumstances violated 18 U.S.C. § 2518, which now requires suppression. Second, he contends that the Nefzger Affidavit contains material

misrepresentations and omissions in violation of *Franks v. Delaware*, 438 U.S. 154 (1978) and he seeks a *Franks* hearing to determine whether the evidence should be suppressed on this ground. Finally, Batista seeks a bill of particulars with respect to Count One of the indictment as well as additional discovery from the government.

I.     **Alternative Investigative Techniques**

An application for wiretap authorization must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . ." 18 U.S.C. § 2518(1)(c). A judge reviewing an application for authorization of a wiretap must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous . . . ." 18 U.S.C. § 2518(3)(c). This requirement was designed to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). The Second Circuit has made it clear, however, that "there is no requirement that any particular investigation procedures be exhausted before a wiretap may be authorized." *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation marks omitted).

In his affidavit, Agent Nefzger described the investigative techniques the government had already employed and explained why a wiretap was required. (Nefzger Aff. ¶¶ 51-63.) Several techniques failed. First, Agent Nefzger indicated that, on approximately ten occasions, investigators unsuccessfully attempted physical surveillance of Batista. (Nefzger Aff. ¶ 53.) They attribute their lack of success to the fact that Batista was aware of the IAB investigation and that, as a police officer, he was trained in surveillance techniques. (*Id.*) The government

also attempted, unsuccessfully, to place a global positioning system ("GPS") tracking device on his vehicle. Unfortunately, due to the parking situation at Batista's home, the investigators were unable to place the device on his car for fear of discovery. (Nefzger Aff. ¶ 54.)

The government had some success with consensually recorded conversations between Batista and his supervisor, Sergeant Kelly, and between Batista and a cooperating witness. These conversations provided useful information, but not enough information to charge Batista. (Nefzger Aff. ¶¶ 55-56.) The government also obtained some information from pen registers, telephone toll analysis, and reviews of Batista's financial statements; however, these methods failed to provide the government with sufficient evidence to charge him. (Nefzger Aff. ¶¶ 61-62.)

Agent Nefzger also explained why numerous other techniques would not work. He indicated that, grand jury subpoenas, undercover agents, interviews with coconspirators, and search warrants of certain premises would not provide sufficient information and might jeopardize the investigation of Batista and other co-conspirators. (Nefzger Aff. ¶¶ 57-62.)

Defendant contends that, prior to seeking the wiretap authorization, the government should have used additional confidential informants, electronic surveillance, pole cameras, roving or stationary surveillance, GPS tracking devices, and additional review of financial statements. (Def. Mem. 20.) In particular, defendant asserts that, the government should have relied more heavily on consensually recorded conversations between Batista and his supervisor, Sergeant Kelly and the use of the confidential informant. (Def. Mem. 21-24.) Defendant attached an affidavit from Gregory B. Salazar, a retired Senior Special Agent with the DEA in support of this contention. (*See generally* Salazar Aff.) Salazar asserts that the government had numerous investigative techniques available that it failed to employ prior to seeking

6

authorization and that the government's reasons for doing so are insufficient to meet the requirements of § 2518(3)(c). (*Id.*)

As a preliminary matter, the court did not consider the Salazar Affidavit in resolving this motion. Defendant submitted the Salazar Affidavit with the implicit assertion that the court should review it as an expert opinion. First, the court does not need the assistance of the proffered expert to resolve this motion. Second, the presentation of this report fails to comply with the requirements of Rule 702 of the Federal Rules of Evidence. Finally, Salazar's credentials with respect to wiretap applications are questionable at best and hardly qualify him as an expert in wiretap investigations. A transcript from a proceeding in which he testified as an expert witness indicates that the bulk of his career focused on undercover work in narcotics conspiracies and related surveillance, not the preparation of wiretap applications. (*See Arizona v. Gamboa-Molina*, CR2006-8681-011DT Transcript; Gov't Ex. 1.) In fact, he admitted on cross-examination that, during his entire tenure as a law enforcement officer, he authored just one wiretap affidavit. (*Id.* at 23.) Further, personnel records from the Department of Justice indicate that Salazar was forced into retirement as an alternative to termination for numerous instances of failure to follow supervisory instructions, inattention to duty, and failure to follow written instructions. (*See* Gov't Exs. 2-4.) These documents indicate that Salazar was unable "to conduct a basic investigation" and, *inter alia*, had failed to follow orders when preparing a wiretap affidavit, which, ultimately, cost the government $104,900 in wasted work-hours. (*See* Gov't Ex. 2 at 3.)

With respect to the merits of Batista's argument, he misconstrues the requirements of § 2518(3)(c). This provision does not preclude the government from seeking a wiretap unless and until it exhausts every other investigative technique. Rather, it only requires that the issuing

judge be informed of the "nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999) (affirming denial of suppression). The government adequately set forth why the suggested techniques would not work and, indeed, might jeopardize the investigation.

Moreover, some of alternative techniques that Batista suggests are patently unrealistic and unreasonable. For example, it is unreasonable to expect, as Batista suggests, that he would discuss criminal wrong doing with Sergeant Kelly, his direct supervisor. The government cannot be faulted for failing to pursue this method before seeking the authorization. Further, Batista contends that the government should have made better use of their confidential informant, co-defendant Alcantara. Alcantara was one of the two men who allegedly shared a woman sexually with Batista. At the time the government sought authorization, it was aware that Batista had accessed his IAB file and knew that one of the men from the sexual encounter was working as a confidential informant. It defies logic to suggest that the government should be faulted for failing to make further use of consensually recorded conversations between Batista and Alcantara, an individual whom Batista likely suspected of assisting the government in building a case against him.

Batista also assails the Nefzger affidavit for using "boilerplate language" to describe why certain techniques would not be fruitful. (Def. Mem. 21.) Defendant claims that this generic or boilerplate language is insufficient to support the authorization of a wiretap. The court rejects Batista's contentions. In considering the information contained in the affidavit as a whole, the information Agent Nefzger provided is similar to showings that other courts have found sufficient to satisfy the requirements of 18 U.S.C. § 2518(3)(c). *See United States v. Gruttadauria*, 439 F. Supp. 2d 240, 248 (E.D.N.Y. 2006) (holding that "the order substantially

complied with the requirements in 18 U.S.C. § 2518(1)(c)"); *see also United States v. Salas*, 07-CR-577 (JGK), 2008 WL 4840872, at *5-6 (S.D.N.Y. Nov. 5, 2008) (denying suppression of wiretap evidence as the government sufficiently set forth reasons for the necessity of the wiretap and why alternative measures would fail).

## II.     Franks

Batista also moves for a *Franks* hearing to determine whether suppression of the wiretap evidence is appropriate, on the ground that the Nefzger Affidavit contained material false statements and omissions.

### A.     Legal Standards

Under *Franks*, when "a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-56. To prevent fishing expeditions, the Court held that to mandate an evidentiary hearing:

> [The challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id.* at 171. Further, "if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id*. at 171-72.

"Probable cause to issue a wiretap order exists when the facts made known to the issuing court are 'sufficient to warrant a prudent man in believing' that evidence of a crime could be obtained through the use of electronic surveillance." *United States v. Ruggiero*, 824 F. Supp. 378, 398 (S.D.N.Y. 1993) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "A reviewing court owes great deference to the prior findings of an issuing judicial officer that probable cause exists." *Salas*, 2008 WL 4840872, at *3 (citing *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)).

### B. Application

There is no basis for a *Franks* hearing in this case because the asserted misrepresentations and omissions fall short of the *Franks* standard.

#### 1. Aracena Wiretap

Batista contends that the "crux" of the government's application is Batista's relationship with Juan Aracena (a known narcotics trafficker), which the government purportedly describes in a misleading manner. (Def. Mem. at 8-12.) Defendant attacks the English translation of one word in a transcript from the Aracena Wiretap of a conversation conducted in Spanish between Aracena and Batista that the government excerpted in the Nefzger Affidavit. The following excerpt is in dispute:

> Then Aracena asked, "what happened to your friend that's interested in the business?" Batista responded, "He's still interested . . . I did not know you wanted to meet him. So, I can call him?" Aracena then stated, "No, when you decide. I told you the one that's interested in me is the one that's suffocating me . . . . Regarding your friend, tell him to call me or we can meet so I can show him the *stuff*. See if he is interested."

(Nefzger Aff. ¶ 16.) Agent Nefzger then indicated that "[t]he term 'stuff,' in context, likely refers to narcotics that Aracena has available for sale." (*Id*.) Defendant contends that the actual Spanish word used in the conversation was "barra," which means "bar" and not "stuff" and that this error is a material misrepresentation. It is the government's position that Aracena said

10

"vaina," which, among other things, can mean "stuff". According to the government, the agent who provided Agent Nefzger with the translation listened to the wiretap recently and maintains that the word used was "vaina," which could have sounded like "barra" because Aracena is of Dominican heritage and likely pronounced the word with a Dominican dialect.

For the purposes of this motion, it does not matter whether the translation should be "stuff" or "bar". Batista grossly overstates the importance of this transcript. It is not the foundation upon which the entire affidavit rests; rather, it is of minor note in the beginning of the Nefzger Affidavit. As set forth more fully below, the Nefzger Affidavit focuses on information obtained from a confidential informant, a cooperating witness, pen registers, and additional sources.

Batista also assails the purpose the government attributes to a meeting between Batista and Aracena. During the course of one conversation, it appears that Batista and Aracena met outside of Aracena's bar shortly after the conversation ended. (Nefzger Aff. ¶ 14.) In his affidavit, Agent Nefzger indicated that he believed that Batista had no lawful reason to meet with Aracena as Batista was not assigned to investigate drug trafficking crimes. (Nefzger Aff. ¶ 15.) Batista does not contest that the meeting occurred, but he asserts that he met with Aracena in the context of an investigation he was conducting into a stabbing that occurred near Aracena's bar and, thus, had a legitimate reason to meet with Aracena. (Def. Mem. at 8.) Batista's assertion is questionable. There are no records of a stabbing that occurred near Aracena's bar at that time or that any investigation was conducted into such a crime. Additionally, the transcripts indicate that Batista and Aracena did not speak about the stabbing over the phone or discuss meeting for that purpose; rather, they limited their discussions to mutual business interests.

### 2. Conversations with Sergeant Kelly

Batista contends that the government omitted "crucial portions" of recorded conversations between Batista and Sergeant Kelly to make him look more culpable. (Def. Mem. at 15.) In particular, Batista asserts that the Nefzger Affidavit should have mentioned that Batista told Sergeant Kelly that Hiciano was an informant of his. (*Id.*) This assertion, too, is questionable. There is no evidence that Hiciano was an informant. Batista did not work on narcotics-related investigations and, at one point, he actually described Hiciano as a friend in one conversation. (Nefzger Aff. ¶ 43.) Moreover, Batista's friendship with Hiciano and his bar-hoping with Hiciano at bars frequented by narcotics traffickers was further corroborated by informants. (Nefzger Aff. ¶¶ 30, 36.)

### 3. Conversations with Calderon

Batista avers that the government relied on a translation of a conversation between Calderon and Batista that contained a critical error and that this error amounts to a material misrepresentation. (Def. Mem. at 13-14.) Upon review of the transcript, it appears that Calderon was near the 90th Precinct and they agreed to meet. Batista indicated that Calderon should come into the Precinct, where they could speak "*en confianza*". In his affidavit, Agent Nefzger indicates that this phrase meant "in secret," thereby attributing an evasive motive to Batista. (Nefzger Aff. ¶ 38.) Batista asserts that this phrase translates into the ability to "speak freely" not secretively, and that the different connotations of these two words amounts to a material misrepresentation to the court. The court notes that the phrase "*en confianza*" can mean many things, including, "in private" or "privately". Thus, this phrase could mean any of the suggested translations or other variations. However, none of these translations or any other of the more minor translation errors that Batista asserts are contained in the Nefzger Affidavit can detract

from the substance of this conversation. Batista repeatedly told Calderon not to worry about any cooperation by Hiciano, a known drug trafficker, because Hiciano was in the Dominican Republic and could not assist the government from outside the country. Indeed, what is most significant about this conversation is Batista's subsequent actions. It was not until after this conversation that he tried to ascertain if he was being investigated by IAB and began to engage in obvious counter-surveillance techniques. (Nefzger Aff. ¶¶ 41-44, 46.) To summarize, Batista's self-serving analysis of the contested assertions in the Nefzger Affidavit has dubious merit.

### 4. Probable Cause

Even assuming the allegedly inaccurate portions of the wiretap application are excised and the alleged omissions included, probable cause nevertheless exists for issuance of the wiretap order. A joint investigation involving the NYC Special Narcotics Prosecutor's Office, the NYPD, and the DEA revealed that Juan Aracena was engaged in drug trafficking. (Nefzger Aff. ¶¶ 11-13.) The joint investigation employed state court approved wiretaps. (Nefzger Aff. ¶ 13.) A review of the evidence obtained pursuant to those wiretap orders indicated that Batista made three phone calls to Aracena and, during one of them, arranged a meeting. (Nefzger Aff. ¶ 14.) At the time of those calls, Batista was not assigned to investigate narcotics trafficking, was not on duty, and had no other lawful reason to contact and meet with Aracena. (Nefzger Aff. ¶ 15.) The IAB investigation began in "March 2006 related to [Batista's] unauthorized contacts with drug traffickers." (Nefzger Aff. ¶ 4.) The Nefzger affidavit excerpted conversations from the Aracena state-court approved wiretap, including conversations between defendant and Aracena. (Nefzger Aff. ¶¶ 16-17.)

Hiciano, a co-conspirator, made post-arrest statements that ultimately incriminated Batista. Hiciano admitted to selling crack cocaine for the prior eight years. (Nefzger Aff. ¶ 19.) He also admitted to knowing Batista for fourteen years, but denied that Batista was involved with drug trafficking. The agents did not believe Hiciano's statements regarding Batista's involvement. (Nefzger Aff. ¶ 21.) At a subsequent proffer session, Hiciano admitted that Batista knew of Hiciano's drug trafficking activities and that Batista told him to stop. He also described Batista as one of his only "clean" friends. The government included these statements in its application for authorization. (Nefzger Aff. ¶ 26.)

Alcantara, another co-conspirator, served as a confidential informant, supplying more incriminating information. He indicated that Hiciano introduced Batista to him. (Nefzger Aff. ¶ 29.) He stated that Hiciano was his best customer. (Nefzger Aff. ¶ 28.) He saw Hiciano and Batista at clubs known to be frequented by narcotics traffickers on several occasions. According to Alcantara, everyone knew that Batista and Hiciano were friends, and Alcantara observed Hiciano hand Batista money on more than one occasion. (Nefzger Aff. ¶ 30.) Additionally, Hiciano once received a phone call from Batista during which Batista warned Hiciano of an impending raid to one of his drug locations. (Nefzger Aff. ¶ 31.)

Finally, there is incriminating evidence from a former cooperating witness, Calderon. Calderon was arrested after Hiciano fled and made statements to law enforcement officers at proffer sessions. (Nefzger Aff. ¶¶ 32-33.) He stated that Batista and Hiciano were friends and went to clubs together. He stated that he was present when Hiciano spoke on the phone with Batista. (Nefzger Aff. ¶ 36.) On November 1, 2006, at the direction of law enforcement officers, Calderon made a recorded call to Batista. Nefzger included translated excerpts of this Spanish conversation in his affidavit. (Nefzger Aff. ¶¶ 38-40.) While the parties may dispute

the translation of certain Spanish terms and phrases in the transcript of this conversation, the overall substance of the conversation remains the same. Batista repeatedly assured Calderon that Hiciano could not be working with the government as a cooperating witness in a narcotics investigation because Hiciano had fled to the Dominican Republic. As the conversation progressed, it appears that Hiciano became wary that Calderon might be working for the government and then sought to distance himself from his earlier comments. Batista even suggested that he barely knew Calderon and that all he knew was that Calderon was a taxi driver. These self-serving statements do nothing to negate the initial, damaging portion of this conversation. In particular, the fact that Batista, a law enforcement officer, would re-assure Calderon that he had nothing to worry about after Calderon indicated that he had been arrested for drug trafficking is problematic to say the least.

In light of the foregoing, the court holds that there is ample evidence to support Judge Ross's finding of probable cause to authorize of the Batista Wiretap.

### III. Bill of Particulars

Batista seeks a bill of particulars with respect to evidence supporting the charge in Count One of the Fifth Superseding Indictment—conspiracy to distribute cocaine base, cocaine, and ecstasy. He contends that he does not have enough information to prepare a defense.

#### A. Legal Standards

Rule 7(c) of the Federal Rules of Criminal Procedure states that an "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The Second Circuit has explained that the purpose of a bill of particulars is to provide a defendant with information concerning the details of the charge against him or her (1) if necessary to the preparation for trial, (2) to avoid prejudicial surprise at trial, or (3) to preclude a

second prosecution for the same defense. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990). In addition, a bill of particulars is only required when "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he [or she] is accused." *Id.* The applicable standard for whether a bill of particulars should issue is not whether the information sought would be helpful to the defense, but whether it is necessary. *United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y. 1994). Moreover, "[a] bill of particulars is not required where the information sought by the defendant has been made available in alternative forms." *United States v. Kelly*, 91 F. Supp. 2d 580, 583-84 (S.D.N.Y. 2000). Nor is it required if it would "force the Government to particularize all of its evidence." *Id.* at 584 (citation omitted).

### B. Application

Batista contends that Count One of the indictment fails to sufficiently set forth his role in the drug trafficking conspiracy. Count One alleges that Batista "together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute . . . cocaine . . . ." (S-5 ¶ 43.)

#### 1. Dates, Times, and Locations of Batista's Activities, Specific Information Batista Gave Conspirators, and any "Other Things" Batista Did

In his first request, Batista seeks the "specific date, or dates, that the alleged information was passed, as well as to whom the information was passed, the actual information that was passed and the method of how it was passed" . . . as well as the details of his criminal actions. (Def. Mem. at 26-27.) The Second Circuit has stated that "[a]cquisition of evidentiary detail is not the function of the bill of particulars." *Torres*, 901 F.2d at 234 (citation omitted); *United States v. Chen*, 05-CR-938 (DAB), 2007 U.S. Dist. LEXIS 57917, at *31 (S.D.N.Y. Aug. 1,

2007) (enumerating and describing cases rejecting defendants' requests for the "'wheres, whens and with whoms' of the crime charged"). The court cannot compel the government to disclose, through a bill of particulars, "the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories, lest the defendant tailor his testimony to explain away the [g]overnment's case." *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (internal citations omitted). While the government may not satisfy its disclosure obligations by providing "mountains of documents to defense counsel who [are] left unguided as to which documents [will] be proven falsified," *Bortnovsky*, 820 F.2d at 575, its disclosure obligations may be satisfied by providing information in other available forms.

In the instant action, the Fifth Superseding Indictment provides sufficient detail. For example, it specifies that:

- On five occasions between June 2003 and August 2003, a confidential informant gave cocaine to a woman in Batista's presence. (S-5 ¶ 10.)

- In approximately April 2006, Batista provided drug traffickers with confidential law enforcement information, prior to a raid. (S-5 ¶ 11.)

- There is detailed information regarding Batista's attempts to determine whether the IAB was conducting an investigation of his activities. (S-5 ¶¶ 14-18.)

- Between January 1998 and July 2007, Batista conspired with others to distribute and possess with intent to distribute one or more controlled substances. (S-5 ¶ 43.)

Additionally, the government provided Batista with the government's application for the Batista Wiretap and Judge Ross's authorization order, both of which provide orderly and detailed

17

accounts of much of the activity underlying Count One in the indictment. The government has produced line sheets and transcripts of conversations intercepted pursuant to the Batista Wiretap as well as Nefzger's 3500 material. Accordingly, Batista's request is denied.

### 2. Identity of Unindicted Conspirators, or the "Others" Referenced in Counts One, Three, Four, Eight, and Nine

Batista, in his second request, asks that the government identify each alleged co-conspirator. The case law in this circuit is clear that the government is not required to provide the identities of alleged co-conspirators. *See, e.g., United States v. Gotti*, 784 F. Supp. 1017, 1018 (E.D.N.Y. 1992) (citing *Torres*, 901 F.2d at 233-34) (stating that the Second Circuit will not find reversible error in a district court's refusal to direct the filing of a bill of particulars as to the names of unindicted coconspirators). Accordingly, Batista's request is denied.

## IV. Discovery Requests

Batista seeks additional discovery from the government. First, he seeks all statements provided by co-defendants Alcantara, Hiciano, and Calderon (CW-1),[3] specifically noting that the government relied on these statements in the Nefzger affidavit. (Def. Mem. at 30.) Batista's request is premature. The request for production of statements from potential witnesses "implicate[s] the Jencks Act, 18 U.S.C. § 3500, which provides that no prior statement made by a government witness shall be the subject of discovery until that witness has testified on direct examination." *United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001).

Second, he seeks a variety of government reports and records. Again, this request is premature. The production of such material is governed by Rules 16(a)(2), and 26.2 of the Federal Rules of Criminal Procedure, and the Jencks Act. Batista cannot obtain law enforcement

---

[3] Calderon is not a co-defendant in this case. According to the government, he pled guilty to a different indictment in *United States v. Spencer, et al.*, 06-CR-613 (DLI). (Gov't Opp. at 23.)

reports, files, or witness statements pre-trial under either Rule 17 or by a motion. Rule 16 expressly prohibits such disclosures. *See* Rule 16(a)(2) ("[T]his rule does not authorize the discovery of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting this case.").

Third, Batista seeks a copy of the Aracena Wiretap application. Batista provided no authority in support of this application. It is uncertain what value, if any, this application would have. The government has already provided Batista with excerpts of the recorded conversations and transcripts. Moreover, at the oral argument on the motion, the government stated that it did not possess any of the Aracena Wiretap documents, which were part of a state investigation and prosecution. The government is not required to provide anything further at this time. Accordingly, this request is also denied.

## CONCLUSION

For the reasons set forth above, Batista's motion is denied in its entirety.


SO ORDERED

DATED:   Brooklyn, New York
         March 31, 2009


　　　　　　　　　　　　　　　　　　　_____/s/_____
　　　　　　　　　　　　　　　　　　　         DORA L. IRIZARRY
　　　　　　　　　　　　　　　　　　　       United States District Judge