UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,            :
                                     :          **OPINION & ORDER**
            -against-                :          06-CR-265 (S-5) (DLI)
                                     :
LUIS M. BATISTA,                     :
                                     :
                        Defendant.   :
--------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On October 26, 2009, Luis Batista, a former detective of the New York City Police Department ("NYPD"), was found guilty after a jury trial of Counts One (conspiracy to distribute cocaine, cocaine base ("crack"), and ecstasy), Two (conspiracy to commit bank fraud), Three (bank fraud), and Eight (obstruction of justice) of an eight-count, fifth superseding indictment.[1]   On January 20, 2010, the United States Probation Department ("Probation") disclosed a presentence report ("PSR"), which subsequently was revised on May 25, 2010 ("Revised PSR").  The parties submitted sentencing memoranda in connection with objections to the PSR and additional factors the parties requested the court to consider.  A supplemental briefing schedule was set on April 6, 2010, and extended on the government's request on May 6, 2010.  On May 26, 2010, the court held oral arguments on the objections to the PSR and Revised PSR.

On June 10, 2010, after hearing oral argument from counsel for both sides and defendant's statement, the court imposed a term of imprisonment of 180 months on each count of conviction to run concurrently with one another.  The court also imposed a term of five years of

_____

[1] The jury also found Batista guilty of Count Seven of the fifth superseding indictment, charging him with Conspiracy to Obstruct Justice.  By an Opinion and Order dated March 24, 2010, the court, inter alia, granted Batista's motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure only with respect to this count.  *See United States v. Batista*, 2010 WL 1193314 (E.D.N.Y. Mar. 24, 2010).  Batista was not named in Courts Four, Five, or Six.

supervised release as to Count One and three years of supervised release as to each of the remaining counts, all to run concurrently with one another. A fine of $25,000 also was imposed. Certain issues raised by the parties and considered by the court in determining Batista's sentence merit discussion. The court therefore provides the basis for its reasoning below.[2]

## I.  Background

Familiarity with the charges, background and procedural history of this case is presumed. The court previously set forth a more-detailed account of the facts and circumstances of this case in its Opinion and Order dated March 24, 2010, granting in part and denying in part, defendant's Rules 29 and 33 motion, and Memorandum and Order dated March 31, 2009, denying defendant's motion to suppress evidence. *See United States v. Batista*, 2010 WL 1193314 (E.D.N.Y. Mar. 24, 2010); *United States v. Batista*, 2009 WL 910357 (E.D.N.Y. Mar. 31, 2009), respectively.

Briefly stated, the relevant facts are as follows: Virgilio Hiciano operated a large narcotics organization in the Bushwick area of Brooklyn, New York. To operate the organization, Hiciano used several apartments inside a building located at 441 Wilson Avenue to store and sell drugs, primarily crack cocaine. Hiciano also stored and packaged drugs at an apartment located at 1127 Decatur Street. Batista, a NYPD Detective, developed a close, friendly relationship with Hiciano, throughout the course of which Batista warned Hiciano about police activity, provided Hiciano with confidential law enforcement information and utilized police department or other law enforcement databases to conduct various queries at Hiciano's request. During the course of investigating Batista's involvement in the narcotics conspiracy

---

[2] This Opinion is intended to supplement the court's reasoning for the sentence imposed as set forth at the sentencing hearing held June 10, 2010, and will be attached to the defendant's Judgment and Commitment Order.

through the use of court-authorized wiretaps on Batista's cell phone and consensual recordings, federal agents also discovered that Batista and William Valerio, a NYPD Sergeant assigned to the Internal Affairs Bureau, committed bank fraud by providing to a municipal credit union, as part of a mortgage loan application, a fraudulent termite inspection and treatment certification form. Federal agents also discovered that Batista tried to obstruct justice by enlisting the aid of a childhood friend, Henry Conde, a NYPD Sergeant assigned to the Internal Affairs Division.[3]

Batista was arrested on January 31, 2008. The jury trial commenced on September 21, 2009. The jury returned a guilty verdict as set forth above on October 26, 2010. The following offense level calculations were set forth in the Revised PSR.[4]

As to Count One, conspiracy to distribute and possess with intent to distribute cocaine base, cocaine, and ecstasy, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), Batista reasonably could be held accountable for the distribution of 150 kilograms or more of cocaine and at least 50 grams of cocaine base ("crack") during the course of the offense and, per U.S.S.G. § 2D1.1(c)(1), the base offense level is 38. (Revised PSR ¶ 63.) Probation also determined that possession of a weapon in furtherance of the narcotics conspiracy was reasonably foreseeable to Batista, and a two-level enhancement per U.S.S.G. § 2D1.1(b)(1) is warranted. (Revised PSR ¶ 64.) As a NYPD officer, Batista abused a position of public trust in facilitating the commission of the narcotics conspiracy, thus warranting a two-level enhancement per U.S.S.G. § 3B1.3. (Revised PSR ¶ 66.) Moreover, Probation found that

---

[3] Henry Conde was acquitted of all charges against him, *i.e.*, Conspiracy to Obstruct Justice and Obstruction of Justice, by the jury on October 26, 2009. He was not named in any other counts of the fifth superseding or underlying indictments.

[4] The court recognizes that the Sentencing Guidelines are now advisory pursuant to the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). However, as the Supreme Court also has instructed, the proper calculation of the applicable sentencing guidelines range in any case is the initial step that must be taken by the court in determining a reasonable sentence. *See Gall v. United States*, 552 U.S. 38 (2007).

Batista perjured himself at trial, falsely denying his role in many material aspects, warranting a two-level enhancement for obstruction of justice per U.S.S.G. § 3C1.1. (Revised PSR ¶¶ 67-69.) Finally, Probation applied a four-level reduction for minimal role pursuant to U.S.S.G. § 3B1.2(a) because Batista did not personally handle, sell or deliver any of the drugs involved in the conspiracy. (Revised PSR ¶ 65.) The resulting adjusted offense level for Count One was thus calculated as 36. (Revised PSR ¶ 151.)

As to Counts Two and Three, conspiracy to commit bank fraud and bank fraud, pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7. (Revised PSR ¶ 70.)[5]

As to Count Eight, obstruction of justice, 18 U.S.C. § 1512(c), because the offense involved the obstruction of the investigation or prosecution of a criminal offense, then per U.S.S.G. § 2J1.2(e), U.S.S.G. § 2X3.1 applies. (Revised PSR ¶ 71.) Thus, the base offense level is six points lower than the offense level for the underlying offense. U.S.S.G. § 2X3.1(a)(1). The offense level for the underlying offense of conviction, the narcotics conspiracy charged in Count One, as determined by Probation, is 36. Therefore, the base offense level for Count Eight is 30. (*Id.*)

Based on these calculations, and per U.S.S.G. §§ 3D1.2(a) and 3D1.4, the Revised PSR set forth a total offense level of 36. (*Id.* ¶ 151.)

## II. Discussion

The parties dispute several aspects of the Revised PSR's guidelines calculation. The government argues that Batista should not receive any mitigating role reduction. Batista

---

[5] Probation determined that no enhancement based on loss to the victim financial institution was warranted as the mortgage loan had been paid for one year before the fraud was discovered and the value of the home had been enhanced. This property was considered collateral pledged that would revert to the financial institution's possession in the event of default on the mortgage. However, the new owner has made and continues to make timely monthly payments. The court, and ultimately all the parties, agreed with Probation's determination.

contends that he should not receive the two-point enhancement for obstruction of justice or the two-point enhancement for possession of a firearm.

## A. A Mitigating Role Adjustment is Unwarranted

Batista concurs with Probation's conclusion that, because he neither handled or directly distributed any of the drugs, and, at most was a peripheral participant in the narcotics conspiracy, he is entitled to either a two-point or four-point reduction for minor or minimal role, respectively, pursuant to U.S.S.G. § 3B1.2. The government objects to Probation's conclusions as reflected in the PSR and opposes Batista's position, contending that the defendant played a unique, invaluable role in the narcotics conspiracy.

Batista bears the burden of proving by a preponderance of the evidence that he is entitled to a mitigating role adjustment. *See United States v. Garcia*, 920 F.2d 153, 156 (2d Cir. 1990). Batista fails to meet his burden here.

The Sentencing Guidelines provide that the minimal role adjustment:

> is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

U.S.S.G. § 3B1.2, comment (n.4). The Sentencing Guidelines also state that "[i]t is intended that the downward adjustment for a minimal participant will be used infrequently." *Id.*; *see also United States v. LaValley*, 999 F.2d 663, 665 (2d Cir. 1993). The Guidelines describe a minor participant as a defendant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment (n.5). The Second Circuit has held that "a lack of knowledge or understanding is essential to a finding of minimal role, and is a relevant factor to be considered in reaching a finding of a minor role." *LaValley*, 999 F.2d at 665 (citation omitted).

Moreover, "the defendant's conduct must be minor or minimal as compared to the *average* participant in such a crime. Accordingly, the fact that a defendant played a minimal or minor role in his offense vis-a-vis the role of his co-conspirators is insufficient, in and of itself, to justify a [mitigating role] reduction." *United States v. Carpenter*, 252 F.3d 230, 235 (2d Cir. 2001) (emphasis added, internal quotation marks and citations omitted).

Here, Batista cannot demonstrate the lack of knowledge that is essential and relevant to finding that either a minimal or minor role adjustment is warranted. There was ample credible evidence adduced during the trial establishing that Batista knew Hiciano ran a major drug distribution organization in the Bushwick area of Brooklyn, as well as where Hiciano stored, packaged and sold his narcotics. (*See* Hiciano's testimony at Tr. 496 (Batista knew Hiciano was "packing crack" at the 1127 Decatur location); Tr. 497 (Hiciano: "I told [Batista] everything. I talk to him about all of my things, where I worked, all of that."); Tr. 414 (Hiciano informed Batista he was a drug dealer); Tr. 442 (Batista told Hiciano that his dealers should not sell in front of Batista when he was at the 441 Wilson location); Tr. 478-79 (Hiciano discussed the price of a kilogram of cocaine with Batista); *see also* Tr. 699.) There was additional ample testimony throughout the record that Batista knew some of Hiciano's key workers, such as Luis "Cookie" Calderon, a livery driver who delivered drugs and picked up narcotics proceeds for Hiciano. *See United States v. Batista*, 2010 WL 1193314 (E.D.N.Y. Mar. 24, 2010) (order granting in part and denying in part motion for judgment of acquittal as to Batista under F. R. Crim. P. 29 and 33).

In addition to Batista's knowledge of the conspiracy, Batista's contributions to the conspiracy demonstrate that he had more than a minor or minimal role. Batista was a unique and invaluable asset to the conspiracy that was not readily replaceable the way a street-level drug seller would be. Moreover, he provided confidential law enforcement information permitting

Hiciano to avoid arrest and a shutdown of his narcotics operations, and minimize any losses due to police actions.

For example, Hiciano testified that Batista knew about Hiciano's actions. (Tr. 497.) Nevertheless, Batista, a NYPD detective and former narcotics undercover officer, dispensed with his oath and duty to uphold the law and protect the public by failing to disclose this information to the police. He thus assisted the conspirators avoid detection by law enforcement. Hiciano further testified that "[e]verybody had the chance to see [him] with a police officer," which was a benefit because it gave Hiciano more "status." (Tr. 576-77; *see also* Tr. 803 (Maria Garcia's testimony that Hiciano informed people that Batista was a police officer).) Given this relationship, it was unlikely that a drug dealer in competition with Hiciano would try to encroach on Hiciano's drug territory and business.

Furthermore, Hiciano testified that Batista used codes to warn him to be cautious if there was a strong police presence in the area at or near Hiciano's operations. (Tr. 494, 523.) Batista would tell Hiciano that he was working at the precinct and everything was fine, if there were no search warrants; alternatively, Batista would say "I'm working today," to warn Hiciano of potential police action. (Tr. 494.) If Batista indicated that there was potential police action, Hiciano would call his workers, tell them to be careful and shut down the operation. (Tr. 494-95.) The fact that Batista warned Hiciano is corroborated by Alexander Alcantara, one of Hiciano's drug suppliers, who testified that he was present when Hiciano received a phone call from Batista warning that the "area gonna be hot." (Tr. 1516-17; *see also* Tr. 1516 (Alcantara's testimony that Hiciano told Batista he was going to call his workers to "close the spot").) Hiciano's testimony was further corroborated by Eileen Pena, one of Hiciano's former girlfriends, and Thomas "Max" Flores, one of Hiciano's former workers at 441 Wilson Avenue.

Pena testified that, in 2001 or 2002, when she expressed her concerns regarding his friendship with Batista, Hiciano responded that he trusted Batista because Batista would let him know when he was going to get raided. (Tr. 2117-18.) Similarly, Flores testified that, on numerous occasions, Hiciano called him or a fellow drug dealer to warn that the drug spot was "hot." (Tr. 835-36.) Once, Flores ignored the warning, and he was arrested. (Tr. 837-39.)

These warnings helped Hiciano avoid detection by the police and permitted his drug business to flourish unhampered. For example, police officers executing search warrants at 441 Wilson Avenue after Hiciano received a warning from Batista, often found no drugs or proceeds or only small quantities of drugs and proceeds. (Tr. 495.)

Additionally, Batista checked confidential NYPD databases for information regarding Hiciano or his drug locations upon Hiciano's request. For example, Batista checked Hiciano's driver's license or other personal information in an NYPD database when Hiciano was concerned that he was driving with a suspended license and did not want to be pulled over by the police and have his car searched. (Tr. 487-88, 492.) Hiciano also testified that, after his apartment had been broken into, allegedly by the police according to neighbors, Batista checked whether the police had obtained a warrant to raid the apartment. (Tr. 498-99.) Computer records and cell phone records corroborate that Batista queried 1127 Decatur Street while Batista was on the phone with Hiciano, a fact Batista admitted only upon being confronted with these records on extensive cross-examination by the government. (*See* Tr. 2365-67.)

Batista also intervened on Hiciano's behalf when Hiciano had contact with the police. For example, Hiciano was questioned by Detective David Milani in connection with a homicide investigation. (Tr. 502.) Detective Milani testified that, after he questioned Hiciano, Batista called him and told him to leave Hiciano alone. (Tr. 1422-25.) Detective Milani testified that it

was unusual for a police officer or detective to try to impede an investigation, particularly a homicide investigation. (Tr. 1424.) It was readily apparent from Detective Milani's demeanor during his testimony that he felt offended by Batista's intervention. Hiciano corroborated the fact that Batista called Detective Milani after Milani questioned Hiciano. (Tr. 500-02.) Hiciano testified that he went to see Batista at the 90th precinct after Hiciano left Milani's precinct. (Tr. 502.) Hiciano further testified that he thanked Batista for calling Detective Milani and Batista replied "that is what we were friends for." (Tr. 502.)

Hiciano also testified that Batista spoke to police officers who had stopped Hiciano's vehicle. (Tr. 698.) Alcantara corroborates this fact. He testified that Hiciano "was drunk and while he was driving . . . the N.Y.P.D. pull[ed] him over twice and he told me that both [ ] times he called Luis [Batista] so Luis can talk to the officers that pull him over and they just let it go, let him go. They let 'Checo' [Hiciano] go." (Tr. 1518.)

Batista's role in the conspiracy stands in stark contrast to that of other members of the conspiracy who were far more dispensable. For example, there were several individuals in the conspiracy whose roles were limited to hand-to-hand drug transactions. Moreover, Hiciano purchased narcotics from Alexander Alcantara and Miguel Santos, (Tr. 374-75, 609-10), and if these individuals did not have any product, Hiciano was able to reach out to other suppliers.

In comparison, Hiciano could not have easily obtained the assistance of another law enforcement official, if Batista was no longer participating in the conspiracy. Average members of a narcotics conspiracy are not typically in a position of such trust and importance, nor do they have access to confidential police information. Indeed, Hiciano testified that, when he was arrested, he was willing to inform the police about his relationship with Alcantara, but did not tell them about his relationship with Batista. (Tr. 531.) Hiciano stated that he wanted to protect

Batista because he "derived benefits from Luis Batista." (Tr. 531.) He "had his protection." (Tr. 531.) Hiciano's statements demonstrate that Batista was a unique and valued member of the conspiracy, quite unlike the individuals from whom Hiciano purchased narcotics and who worked for Hiciano.

Batista argues that, despite these alleged valuable contributions, his impact on the conspiracy nevertheless was minimal. (Def. 2/10/10 Letter, at 15-16.) For example, he never packaged, sold, delivered or otherwise handled any cocaine. Batista also argues that he was not involved in the daily operations of the conspiracy and the conspiracy did not rely on him for its continued existence. Batista contends that any assistance he gave regarding police activity was clearly irrelevant because the police successfully raided the 441 Wilson Avenue location on several occasions. As additional evidence of the conspiracy's lack of dependence on him, Batista cites to the conspiracy's existence before he became involved and the fact that he and Hiciano went for long periods of time without speaking.

Defendant's contention that evidence of successful police raids at 441 Wilson Avenue belies the importance of his alleged role in the conspiracy do not alter the court's finding, as it is without merit. Flores testified that he and other workers sometimes disregarded Hiciano's warnings to close the operations and, as a result, would be arrested and small amounts of drugs would be seized. (Tr. 835-38.) Notably, as already discussed above, Batista's warnings helped Hiciano minimize the amount of drugs and proceeds seized during the police raids that were "successful."

Defendant's argument that he did not have a direct role in the conspiracy is similarly without merit. A defendant is not entitled to a mitigating role adjustment merely because he fails to handle, sell or deliver drugs. *See United States v. Ayers*, 84 F.3d 382, 384 (10th Cir. 1996) (no

mitigating role adjustment warranted even though the defendant never personally possessed or distributed narcotics); *see also Garcia*, 920 F.2d at 155 ("[Section] 3B1.2 does not turn solely upon [a defendant's] status or his assigned task in the criminal enterprise."). Significantly, even where a defendant's role is limited to helping accomplices avoid detection, courts have held that no mitigating role reduction is warranted. *See, e.g.*, *United States v. Vargas*, 170 Fed. Appx. 779 (2d Cir. 2006) (no mitigating role reduction where defendant "repeatedly warned his co-conspirators of the police presence and carried instructions for converting black tar heroin"); *see also United States v. Gunning*, 984 F.2d 1476, 1484-85 (7th Cir. 1993) (no role reduction where defendant knew about the drug deal and accompanied her husband to purchase the drugs where he acted as surveillance and she carried a gun in her purse); *United States v. Avalos*, 343 Fed. Appx. 225, 225-26 (9th Cir. 2009) (no role reduction for driver of lookout vehicle in smuggling operation because he was an "integral part" thereof); *United States v. Benitez*, 233 Fed. Appx. 955, 957-58 (11th Cir. 2007) (no role reduction where defendant accompanied the seller to a drug deal as an armed lookout).

Therefore, merely because Batista was not involved in the daily operation of the conspiracy is insufficient to justify a mitigating role reduction under the circumstances of this case. Batista's value to the conspiracy is summarized eloquently by Hiciano's statement to law enforcement agents that he was unwilling to provide Batista's name to them because Hiciano wanted to protect Batista in order to continue receiving benefits.

In sum, in light of the credible testimony adduced at trial, Batista is unable to prove by a preponderance of the evidence that he played a minor or minimal role in the conspiracy. In fact, the proof establishes by a preponderance of the evidence that Batista provided a valuable and unique service to the conspiracy that helped the conspiracy avoid detection by law enforcement,

and he had knowledge of the scope and structure of the illicit enterprise. Accordingly, the court finds that he is not entitled to either a minimal or a minor role reduction.

**B.      Batista's Materially False Statements Warrant a Two-Point Enhancement for Obstruction of Justice**

The government argues that Batista should receive an enhancement for obstruction of justice because Batista committed perjury when he testified at trial and caused his attorneys to provide materially false information in a submission to the court. Probation agrees and incorporated a two-point enhancement for obstruction of justice on this ground in its final calculation of the total offense level. Batista opposes, claiming he did not perjure himself. For the reasons set forth below, the court concurs with the government and Probation that a two-point enhancement for obstruction of justice applies in this case.

Section 3C1.1 of the Sentencing Guidelines provides that:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

The Guidelines further provide examples of obstructive conduct, including "providing materially false information to a judge or magistrate" and "committing . . . perjury." U.S.S.G. § 3C1.1, comment (n.4(b) & (f)).

The enhancement includes a willfulness requirement. *See United States v. Dunnigan*, 507 U.S. 87, 95 (1993). Accordingly, the Second Circuit has "generally limited the application of the Guideline to those cases in which the defendant had a specific intent to obstruct justice." *United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003) (internal quotation marks and citations omitted). "In some cases, however, conduct may be 'so inherently obstructive of the administration of

justice' that the enhancement should be applied if the defendant deliberately engaged in that conduct, regardless of her specific purpose." *Id*. (citation omitted). "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence. In determining the intent with which a defendant acted, a district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence." *Id.* (citations omitted).

### 1. Materially False Information to the Court

The court finds that the obstruction of justice enhancement is warranted because Batista provided materially false information to the court in a brief submitted in support of a motion to suppress evidence. Information is material when, "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment (n. 5); *see also United States v. Rodriguez*, 943 F.2d 215, 217-18 (2d Cir. 1991). Therefore, an obstruction enhancement under Section 3C1.1 may be imposed on the basis of a defendant's knowingly false statements submitted in support of a motion to suppress, if the statements could have influenced the disposition of the suppression motion. *See, e.g*., *United States v. Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000) (false statements in support of a motion to suppress justified enhancement under Section 3C1.1).

Before trial, Batista moved to suppress all evidence from a court-ordered wiretap on his mobile phone. Batista claimed, among other things, that the government, in applying for the wiretap, failed to advise the court of information demonstrating that Batista's relationship with Hiciano was non-criminal. In his reply brief in further support of his motion to suppress, Batista claimed that Hiciano was his informant and that Batista advised NYPD Lieutenant Robert Rios of that fact in May 2006, before Batista was charged in this case. (*See* Docket Entry 116, at 7.)

However, at trial, Batista admitted that Hiciano was not his informant and that his contrary assertion to the court was false. (Tr. 2421-22, 2429.) On cross-examination, Batista was asked whether he told Rios that Hiciano was his informant, and Batista said that he did not. (Tr. 2421-22.) Lieutenant Rios corroborated this in his testimony. (Tr. 1606-07.) Batista then was asked whether, in connection with a defense memorandum or brief submitted to the court, he told a member of the defense team that he informed a narcotics supervisor at a May 2006 meeting that Hiciano was his informant. (Tr. 2428.) After initial attempts to claim lack of knowledge, he ultimately confirmed that he did, and that it was not true. (Tr. 2421-22, 2428.)

If believed, Batista's false statement could have tended to influence or affect the issue under determination and contributed to the suppression of extensive wiretap evidence, which then would have affected the trial. The wiretap evidence was a critical component of the government's proof, especially as to Batista's attempts to cover up his association with Hiciano and other members of the narcotics conspiracy, the bank fraud and obstruction of justice charges alleged in the indictment, and other acts by Batista that went to his credibility before the jury. Moreover, the court finds that these statements were deliberately false. The only reason for Batista to have falsely claimed that Hiciano was his informant was to obstruct justice in an attempt to suppress the evidence against him. *See United States v. Kirsh*, 54 F.3d 1062, 1073-74 (2d Cir. 1995) (enhancement applied where defendant willfully caused his attorney to file a false affidavit in an attempt to get bail). Therefore, the court finds that the application of the enhancement is proper based on Batista's materially false statement to the court.

## 2. Perjury

Even though evidence of the materially false statement to the court is a sufficient basis for applying the enhancement, the court finds that there is additional evidence that further

warrants the enhancement. The court finds that Batista committed perjury at trial. To apply the enhancement on grounds of perjury, the district court must find that "'all of the factual predicates for a finding of perjury'" have been shown. *United States v. Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001) (quoting *Dunnigan*, 507 U.S. at 95). The court must "find that the defendant gave 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory . . . .'" *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997) (quoting *Dunnigan*, 507 U.S. at 94).

The Second Circuit has held that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," but it is nevertheless sufficient if the court it "makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *Dunnigan*, 507 U.S. at 95; *see also United States v. Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993). Where a defendant's PSR provides mere conclusory assertions of obstruction of justice, adoption by the court of the PSR's findings does not satisfy the *Dunnigan* requirement. *See United States v. Johns*, 324 F.3d 94, 97 (2d Cir. 2003) (citing *United States v. Ben-Shimon*, 249 F.3d 98, 103-04 (2d Cir. 2001); *United States v. Williams*, 79 F.3d 334, 337 (2d Cir. 1996)); *see also United States v. Bradbury*, 189 F.3d 200, 205 (2d Cir. 1999) ("PSR's conclusions were not sufficient to support an obstruction enhancement."). However, if the PSR is "sufficiently detailed and explicit," then the adoption by the district court satisfies the obligations imposed by *Dunnigan*. *See Johns*, 324 F.3d at 98 (PSR set forth reasonably detailed findings, such as describing the defendant's testimony at a suppression hearing and at trial, as well as noting the testimony that contradicted the defendant's testimony); *see also United States v. Thompson*, 76 F.3d 442, 456 (2d Cir. 1996). The court sets forth below

its detailed findings to ensure the clarity of its reasoning even though the PSR set forth facts supporting a finding of perjury by Batista.

The government argues that there are several instances where Batista lied under oath. For example, the government argues that Batista denied knowing that Hiciano was a drug dealer when Batista met him and claimed not to recall when he determined that Hiciano was a drug dealer. (Gov't 2/17/10 Letter, at 4-5; Gov't 5/19/10 Letter, at 1-2; *see also* PSR ¶¶ 67, 69.) Batista argues that the evidence is not clear that Batista knew Hiciano was a drug dealer when they met. (Def. 2/10/10 Letter at 9-10.) Batista contends that Hiciano was asked only "when you became friends, did Batista ever learn that you were a drug dealer." (Tr. 67-68.) Batista therefore argues that Hiciano testified that it was not until they became friends that Hiciano allegedly told Batista that he was involved in drugs. (Def. 2/10/10 Letter at 10.) Batista also argues that he acknowledged during his testimony that there did come a point when he knew Hiciano was involved with drugs. (*Id.* (citing Tr. 2464-70).) Batista was unable to pinpoint an exact time, but he knew for certain of Hiciano's activities in 2004, when he learned that Hiciano had been arrested and confronted Hiciano with the information. (*Id.* (citing Tr. 2292, 2295, 2464-65, 2469, 2611).) Whether the testimony regarding when Batista became aware that Hiciano was a drug trafficker is sufficient for the imposition of the enhancement is of no moment, as several other portions of Batista's testimony were clearly perjurious.

First, throughout Batista's testimony, he falsely denied providing Hiciano assistance. For example, Batista claimed that he never advised Hiciano of police activity in and around 441 Wilson Avenue. (Tr. 2251-52.) Batista also denied that he called police officers when Hiciano was pulled over for traffic violations. (Tr. 2285, 2327.) However, these assertions were credibly contradicted by the testimony of other witnesses. As described above, Hiciano, Alcantara and

Pena testified that Batista warned Hiciano to be cautious if there was a strong police presence or activity in the area at or near Hiciano's operations. (Tr. 494, 523, 494-95, 1516-17, 2117-18; *see also* Tr. 835-38.) Hiciano and Alcantara testified that Batista spoke with police officers on Hiciano's behalf when Hiciano's vehicle had been stopped, (Tr. 698-99, 1518). Hiciano further testified that Batista checked NYPD databases for information upon Hiciano's request, (Tr. 487-88, 492, 498-99), and intervened when Hiciano was being interviewed by Detective Milani, (Tr. 500-02; *see also* Tr. 1422-25 (Detective Milani's testimony)).

Second, Batista denied having any drug-related conversations with Hiciano. Batista initially testified that he never had "any drug-related conversations with [Hiciano] of any type." (Tr. 2252.) However, Hiciano testified to several such conversations. For example, as noted above, Hiciano testified that Batista was aware of Hiciano's activities because Hiciano "told him everything," (Tr. 497), he informed Batista that he was a drug dealer, (Tr. 414), and Batista told Hiciano to tell the workers not to sell drugs in front of him, (Tr. 442). Additionally, Batista and Hiciano had a conversation during which they discussed the cost of a kilogram of cocaine. (Tr. 478.) On one occasion, Batista stayed overnight in Hiciano's apartment, and Batista found a small bag in which crack is packed. (Tr. 484.) Hiciano testified that Batista told him, "you need to be more careful when [you do] that, because sometimes it could be dangerous." (Tr. 485.) Moreover, on re-direct examination, when asked about a computer search he ran on Hiciano, Batista stated that he ran the search to determine whether Hiciano had been arrested for involvement in narcotics and that, in relation to his inquiry, he did in fact have "a conversation with Mr. Hiciano about him participating in drugs." (Tr. 2611.)

Third, Batista denied knowing where Hiciano sold drugs. Batista testified that he "didn't know where [Hiciano] was selling drugs at. . . . I didn't know who he was giving drugs to or

where he had his dealing at." (Tr. 2552; *see also* Tr. 2621 (Batista's testimony that he never was aware that Hiciano was using 441 Wilson Avenue to distribute drugs).) However, the testimony at trial demonstrates that it is patently unbelievable that Batista did not know where Hiciano sold drugs. Batista grew up in the area of Brooklyn in which Hiciano was selling drugs, and testified that he went to school a block from Wilson Avenue, he "lived all over Wilson Avenue," and his daughter's former school was on Wilson Avenue. (Tr. 2255-56, 2261). Moreover, Hiciano testified that Batista spent time with Hiciano at a barber shop only a couple of doors down the street from 441 Wilson Avenue, where drug customers went in and came out continuously, frequently engaging Hiciano in drug-related conversations. (Tr. 440-43.) Batista's directive to Hiciano as they stood on Wilson Avenue that Hiciano's workers should not sell drugs in front of him is further evidence of Batista's awareness. (Tr. 442.) There is no question, based on the testimony of Hiciano, Lieutenant Rios, and the police officers who testified as defense witnesses as to the execution of search warrants at 441 Wilson Avenue, that Hiciano was the most significant and notorious drug dealer in control of that area. As described above, Batista alerted Hiciano to any police activity in the area, and specifically his drug spots.

Fourth, Batista denied checking a NYPD's database at Hiciano's request for information about the stash house located at 1127 Decatur Street. At trial, Batista denied having had a phone conversation with Hiciano about the query. For example, on direct examination, Batista was asked whether he received a call about someone breaking into 1127 Decatur Street and whether he received a request to check whether there were any warrants for that location. (Tr. 2290-91.) He replied that it never happened. (Tr. 2291.) On cross-examination, he repeated his false denial, stating "I never talked to Virgilio Hiciano about running anything." (Tr. 2365-66.) However, as described above, cell phone and computer records demonstrated that Batista was

speaking on the phone to Hiciano at the very moment Batista queried the NYPD database regarding 1127 Decatur Street. (Tr. 2367.) When presented with the foregoing documentary evidence on cross-examination, Batista eventually admitted that he was on the phone with Hiciano at the time he checked the database for 1127 Decatur Street. (Tr. 2367, 2610.)[6]

The court finds that these statements are material and that Batista made these false statements willfully, as the only reason for Batista to have made these false statements was to obstruct justice in an attempt to affect the outcome of his trial. Batista was adamant regarding his answers and his denials could not have been made as a result of confusion, mistake or faulty memory.

In response to the evidence of perjury, Batista argues that he made numerous admissions during the trial, including altering the termite inspection documents and committing bank fraud, conducting several computer checks on Hiciano, being friends with and socializing with Hiciano and accepting free drinks from him despite knowing he was involved in criminal activity, committing larceny at Home Depot and improperly using his NYPD badge to get favorable treatment in clubs. (Def. 2/10/10 Letter, at 10.) Batista argues that these admissions are "hardly the mark of an individual obstructing the trial of this matter." (*Id.* at 11.) Nevertheless, even if Batista provided some true statements to the court, this does not diminish the fact that, as demonstrated above, he also provided materially false statements.

---

[6] Batista also attempted to claim that his query of 1127 Decatur Street was in relation to a case involving a suspect totally unrelated to this case, Louis Hyman, and that he documented the query in the Hyman case file. (Tr. 2288-89, 2583-95, 2626-27.) However, the Hyman case file documents a different search run by another person. After prolonged questioning, Batista admitted that he failed to document his query of 1127 Decatur Street. (Tr. 2626-30.) Batista's patently false claim that the query was in relation to the Hyman case file resulted in a substantial diversion of resources and delay in the trial. This example further supports the court's finding that the enhancement is warranted. As the Supreme Court has noted, a "defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened." *Dunnigan*, 507 U.S. at 97-98.

Batista also argues that the evidence against him consisted primarily of the testimony of Hiciano, which was vague and contradicted, and, thus, cannot be used as a basis for the enhancement. (*Id.*) Batista argues that the mere fact that the jury accepted Hiciano's testimony is insufficient because, as the *Dunnigan* court recognized, "not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury." *Dunnigan*, 507 U.S. at 95. Batista contends that in *Dunnigan*, at least five witnesses testified that they took part in or observed Dunnigan's drug trafficking during the relevant time period. 507 U.S. at 95-96. Batista also argues that, in *Johns*, the government provided audiotaped controlled calls, DEA agent observations and the recovery of drugs from the defendant. *See Johns*, 324 F.3d at 98. Batista further relies on *United States v. Williams*, 79 F.3d 334 (2d Cir. 1996), to argue that, because Batista was not caught in any objective lie, the enhancement is unjustified. In *Williams*, the district court "found that '[b]ased upon the whole record that I have seen [and] the testimony that I have heard,'" the defendant obstructed justice, and the Second Circuit reversed, holding that "the district court fell short of making the necessary findings" because "[t]he record does not contain the required finding that [the defendant] knowingly made a false statement under oath." *Id.* at 337.

Contrary to defendant's assertions, the Courts in *Dunnigan*, *Johns* and *Williams* did not hold that objective evidence is required for a finding of perjury. Instead, they held that the district court is required to make an actual finding of perjury, specifying the false statements, and cannot rely on conclusory statements contained within the PSR. *See United States v. Salim*, 549 F.3d 67, 74 (2d Cir. 2008) (distinguishing *Williams*, and holding that the court's explicit findings that the defendant's statements were false and made intentionally were sufficient); *Johns*, 324 F.3d at 98 (distinguishing *Williams* and holding that the enhancement was justified where "the

PSR sets forth reasonably detailed findings in support of its conclusions"); *see also supra* at p. 13. Indeed, in *United States v. Kerley*, 544 F.3d 172, 182 (2d Cir. 2008), the Second Circuit affirmed the district court's finding of perjury based on the defendant's "attitude and demeanor, inconsistent explanations, and failure to raise the defenses during the innocence proffer, and a lack of supporting evidence."

As discussed above, and described more fully in the court's March 24, 2010 Order denying Batista's Rules 29 and 33 motion as to all counts of conviction except Conspiracy to Obstruct Justice, Hiciano's testimony was credible and it was corroborated by documentary evidence and the testimony of several other witnesses. The court finds that the inconsistencies in Batista's testimony at trial, in conjunction with the testimony of other witnesses, along with the documentary evidence provided by the government at trial, demonstrate that Batista gave false testimony under oath. In sum, based on the materially false information provided to the court with respect to Batista's motion to suppress and the materially false statements Batista made at trial while under oath, the court finds that Batista should receive an enhancement for obstruction of justice pursuant to Section 3C1.1 of the Sentencing Guidelines.

**C.    Batista's Knowledge of the Use of Firearms in Narcotics Transactions Warrants a Two-Point Enhancement for Possession of a Firearm in Furtherance of this Narcotics Conspiracy**

Batista argues that the two-point enhancement for possession of a firearm in furtherance of the narcotics conspiracy is not warranted because he never saw Hiciano in possession of a firearm. Initially, in its original PSR, Probation did not include an enhancement for this factor. However, upon consideration of the government's objections and arguments supporting the application of the enhancement, Probation reversed its position and agreed that the enhancement

is warranted. For the reasons set forth below, the court concurs with the government and Probation that the enhancement is warranted under the circumstances of this case.

U.S.S.G. § 2D1.1(b)(1) provides for a two-level enhancement if a dangerous weapon, including a firearm, is possessed during the commission of a drug offense, "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n. 3). "The defendant need not have . . . actual knowledge of the weapon's presence; the enhancement is required so long as the possession of the firearm was reasonably foreseeable to the defendant." *United States v. Stevens*, 985 F.2d 1175, 1188 (2d Cir. 1993). The enhancement "follows from the basic rule that conspirators are liable for the reasonably foreseeable acts of their co-conspirators in furtherance of the conspiracy." *United States v. Aduwo*, 64 F.3d 626, 629 (11th Cir. 1995) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

Under the facts and circumstances here, the court finds that it was reasonably foreseeable to Batista that a firearm would be used in the course of the conspiracy. Hiciano used and carried a firearm during and in relation to the narcotics conspiracy according to Hiciano's trial testimony. Although no evidence was introduced that Batista had actual knowledge of the firearm, as the Second Circuit has noted, "guns are frequently tools of the drug trade." *United States v. Hernandez*, 85 Fed. Appx. 269, 271 (2d Cir. 2004) (citing *United States v. Flaharty*, 295 F.3d 182, 200 (2d Cir. 2002)); *United States v. Bermudez*, 529 F.3d 158, 170 (2d Cir. 2008) ("It is axiomatic that drug dealing and guns go hand in hand."); *United States v. Soto*, 959 F.2d 1181, 1187 (2d Cir. 1992); *Stevens*, 985 F.2d at 1188. Batista was a trained NYPD detective who had worked for a substantial period of time as an undercover narcotics officer. Batista testified that, in that capacity, he had confronted many dangerous situations and that drug dealers often used firearms during drug transactions. Batista maintained a close and intimate relationship with

Hiciano, a known drug trafficker who controlled most, if not all, of the crack trafficking in Bushwick. Hiciano testified that everyone knew that he was a narcotics trafficker, (Tr. 584), and, as described above, Hiciano also told Batista about his narcotics operation. Moreover, Batista spent considerable time with Hiciano, at clubs and also at the barbershop that was in close proximity to 441 Wilson Avenue. (Tr. 472-73.) During their time spent together, Batista met members of the conspiracy and was present when members of the conspiracy spoke with Hiciano about his operations. (Tr. 419-23 (Hiciano's testimony that Batista met several members of the conspiracy).) Furthermore, Batista's inquiry to Hiciano regarding the cost of a kilogram of cocaine demonstrates Batista was aware of the size and scope of Hiciano's narcotics operation. (*See* Tr. 478.)

The court further notes that defendant's own sentencing submissions support the fact that it was reasonably foreseeable to him that Hiciano or any of the narcotics conspirators would possess or use a firearm in connection with the narcotics conspiracy. Defendant's evaluations from his NYPD Narcotics Division supervisors demonstrate that he had excellent street skills, knew the language of the street, and knew all there was to know about street level buy-and-busts and long-term investigations.

Indeed, Batista stated at trial that "Sometime around 1999, now I get transferred to Narcotics, so I'm in Manhattan . . . and now I'm also working undercover, and my safety is at risk. I'm going into buildings every day, I'm going into apartments, I'm dealing with drug dealers who are armed a lot of times." (Tr. 2269; *see also* 2270 (Batista's testimony that when he saw an individual from whom he had purchased drugs while working undercover, it was a "reality check" because "in my mind, I could have been killed").) Although Batista's testimony regarding his undercover experience was stricken as non-responsive, it demonstrates that Batista

was aware that firearms were often used as part of a narcotics operation. Therefore, Batista should have reasonably foreseen that at least one member of the large-scale narcotics operation would possess a firearm during the conspiracy's existence, which spanned more than a decade.

Batista concedes that actual knowledge is not required, but argues that it was not reasonably foreseeable that Hiciano possessed a firearm. (Def. 2/10/10 Letter, at 13-14.) Batista contends that there was no testimony that Hiciano ever told Batista about the firearm, and the government did not ask Hiciano whether Batista knew about the gun. Batista also argues that his statement regarding his undercover work was not with regard to this conspiracy, and that general knowledge of firearm use in narcotic conspiracies is insufficient. Batista further contends that possession of a firearm by a co-conspirator may only be deemed reasonably foreseeable when there is a physical nexus between the defendant and the firearm, such as being present when the firearm was present or otherwise present in a location where a firearm was being stored. To support this argument, Batista contends that, in the Second Circuit case law addressing whether use or possession of a firearm in connection with a narcotics conspiracy is reasonably foreseeable, the enhancement was applied only where such a physical nexus existed.

Batista's contention that the firearm enhancement does not apply because Hiciano never informed him of the firearm is without merit, as Batista concedes that actual knowledge is not required. Moreover, although courts will often use physical proximity as a basis for demonstrating reasonable foreseeability, Batista has not pointed to anything in the case law that imposes a *requirement* of physical proximity. Physical proximity is merely one method— perhaps one of the most clear cut methods—of demonstrating that use of a firearm was reasonably foreseeable. The court finds that there is no legal basis for imposing a requirement of physical proximity in the analysis of whether use or possession of a firearm is reasonably

foreseeable, particularly in the context of this case and the court will not impose such a requirement without a rationalized basis for doing so.

Other circuits that have addressed this question have found that a physical nexus is not required. *See, e.g.*, *United States v. Traylor*, 184 F.3d 816, at *21 (5th Cir. 1999) (rejecting the defendant's argument that the government had to prove that he was present at the location where the weapons were found, and stating that "the only requirement is that the co-conspirator's possession was reasonably foreseeable"); *United States v. Mangual*, 278 Fed. Appx. 267, 272 (4th Cir. 2008) (rejecting the argument that section 2D1.1(b)(1) "demands some form of a physical nexus between the defendant and the firearm held by a co-conspirator" and imposing the enhancement despite the defendant's argument that he had never been to the residence where the firearm was located and was not otherwise aware that the co-conspirator possessed a firearm); *Millon v. United States*, 2009 WL 3258580, at *6 (W.D.N.C. Oct. 7, 2009) (no "physical nexus" to the firearm required).

Moreover, other circuits have held that use or possession of a firearm was reasonably foreseeable based on the size or type of the conspiracy and the acknowledgment that firearms are often tools of the drug trade. *See, e.g.*, *United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006) ("In light of the vastness of the conspiracy and the large amount of drugs and money being exchanged in this case, the district court did not clearly err by finding that it was reasonably foreseeable that a firearm would be possessed by a co-conspirator."); *United States v. Kimberlin*, 18 F.3d 1156, 1160 (4th Cir. 1994) ("'[A]bsent evidence of exceptional circumstances, . . . it [is] fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash.'" (citation omitted)); *United States v.*

*Beckford*, 93 Fed. Appx. 571 (4th Cir. 2004) ("The presence of guns to perpetrate illicit drug activity typically is reasonably foreseeable."); *United States v. Fredell*, 79 Fed. Appx. 799, 812 (6th Cir. 2003) (defendant should have "reasonably foreseen that [his co-conspirator] would carry a weapon in connection with their extensive drug operation"); *see also United States v. Moreira*, 317 Fed. Appx. 745, 748-49 (10th Cir. 2008) (scope of the conspiracy and defendant's relationship with co-conspirator can support finding that possession of firearm was reasonably foreseeable); *United States v. Vazquez-Rivera*, 470 F.3d 443, 447 (1st Cir. 2006) ("'[A] defendant's awareness of the inner workings of a conspiracy in which he is participating . . . frequently will suffice to prove the defendant's ability to foresee the acts of coconspirators.'" (citation omitted)).

The Second Circuit has indicated that it agrees with this position when the defendant has had prior experiences with narcotics and firearm offenses. *See United States v. Hernandez*, 85 Fed. Appx. 269, 271 (2d Cir. 2004) (where defendant's past criminal record included multiple convictions for possession of narcotics and firearms and he stipulated that he knew he was involved in the sale of approximately $50,000 worth of heroin, the court stated that in light of the defendant's "experience with drugs and weapons, the district court did not commit clear error in finding by a preponderance of the evidence that it was reasonably foreseeable that one of his confederates would be armed during the course of such a high-value drug deal"). In this case, through his training and experience as an undercover narcotics officer, Batista was keenly aware that firearms are narcotics traffickers' "tools of the trade."

In sum, the court finds that physical proximity is not a requirement for a finding that possession of a firearm by a coconspirator was reasonably foreseeable, and that a defendant's general awareness from prior experiences that firearms are used in narcotics transactions can

suffice in instances where the conspiracy involves large amounts of narcotics. Here, not only was the conspiracy large and complex, but Batista's testimony regarding his knowledge that drug dealers are often armed demonstrates Batista's personal awareness of the use of firearms in narcotics transactions. Batista's acknowledgement, in the context of a large drug conspiracy, is sufficient to demonstrate that it was reasonably foreseeable to him that a firearm would be used in the course of the conspiracy. Therefore, the court finds that the enhancement for possession of a firearm in furtherance of the narcotics conspiracy pursuant to U.S.S.G. § 2D1.1(b)(1) is appropriate.

## III. Conclusion

The court finds that the enhancements for possession of a firearm and obstruction of justice are warranted. The court further finds that Batista is not entitled to a mitigating role reduction. The court, therefore, calculates the guideline range as follows. Count One has a base offense level of 38, plus two points for possession of a firearm, two points for abuse of a position of trust, and two points for obstruction of justice, for an adjusted offense level of 44. The calculation of Counts Two and Three remain the same, and they have an adjusted offense level of 7. Count Eight has an adjusted offense level of 30. U.S.S.G. § 2X3.1(a)(3)(A). The highest offense level is 44. The analysis in the Revised PSR regarding the multiple-count adjustment remains the same, except that the adjusted offense level is 44, and the total offense level is 44. (*See* Revised PSR ¶¶ 142-151.) Pursuant to the guidelines sentencing table, the highest offense level accounted for is 43, which has a sentencing guidelines range of life imprisonment.

For the reasons stated on the record and elaborated in this Opinion and Order, Batista was sentenced to a term of imprisonment of 180 months on each count of conviction to run concurrently with each other. The court also imposed a term of five years of supervised release

as to Count One and three years of supervised release as to each of the remaining counts, all to run concurrently with one another.  A fine of $25,000 was also imposed.

SO ORDERED.

Dated:  Brooklyn, New York
        August 9, 2010

                                            _____
                                                      /s/
                                            DORA L. IRIZARRY
                                            United States District Judge